```
                  UNITED STATES DISTRICT COURT
                  EASTERN DISTRICT OF MISSOURI
                         EASTERN DIVISION

CINDY PEARSON,                     )
                                   )
            Plaintiff,             )
                                   )
      v.                           )    No. 4:10 CV 1166 DDN
                                   )
MICHAEL J. ASTRUE,                 )
Commissioner of Social Security,   )
                                   )
            Defendant.             )
```

## MEMORANDUM

This action is before the court for judicial review of the final decision of defendant Commissioner of Social Security denying the application of plaintiff Cindy Pearson for disability insurance benefits (DIB) under Title II of the Social Security Act, 42 U.S.C. § 401, et seq., and supplemental security income (SSI) under Title XVI of the Act, 42 U.S.C. § 1381, et seq. The parties have consented to the exercise of plenary authority by the undersigned United States Magistrate Judge pursuant to 28 U.S.C. § 636(c). (Doc. 11.) For the reasons set forth below, the ALJ's decision is affirmed.

## I. BACKGROUND

Plaintiff Cindy Pearson was born on December 3, 1957. (Tr. 27.) On January 16, 2007, she filed applications for DIB and SSI, alleging an onset date of October 31, 2006. (Tr. 97-106, 107-109.) She alleged disability due to manic depression, bipolar disorder, anxiety, panic attacks, and her past alcoholism and drug addiction. (Tr. 127.) She received a notice of disapproved claims on February 23, 2007. (Tr. 60-64.) She filed a written request for a hearing on April 18, 2007. (Tr. 67.) After a hearing on December 16, 2008, the ALJ denied benefits on February 25, 2009. (Tr. 22-56, 8-21.) On May 25, 2010, the Appeals Council denied her request for review. (Tr. 1-4.) Thus, the ALJ's decision stands as the final decision of the Commissioner.

## II. MEDICAL HISTORY

After a telephone call on January 16, 2006, Richard Murray, M.D., prescribed Pearson samples of Effexor.[1] (Tr. 195.) Dr. Murray prescribed her Effexor with refills on January 28, 2006, May 9, 2006, June 28, 2006, and September 22, 2006. (Tr. 194-98.) On February 28, 2006, Pearson called Dr. Murray and said that she was having panic attacks. (Tr. 194.) On June 7, 2006, Dr. Murray excused Pearson from work through June 7, 2006. (Tr. 191.)

On August 1, 2006, Pearson was seen by Dr. Murray for extreme pain in her shoulder and neck. (Tr. 179.) She was off work for ten to fourteen days prior to this appointment. (Id.) On examination, she had free range of motion of the neck and shoulders. (Id.) Dr. Murray prescribed her Relafen[2] 500 mg and stretching exercises. (Id.) On October 31, 2006, Dr. Murray saw Pearson for her concerns about personal issues and a sexual encounter she had three to four months prior. (Tr. 178.) Dr. Murray noted some breakthrough anxiety symptoms, which led her to miss a few days of work. (Id.)

On November 28, 2006, a psychiatrist, Ahmad Ardekani, M.D., saw Pearson and noted that she had an unstable mood and history of panic attacks, bipolar disorder, and alcoholism. (Tr. 214.) Her mood and affect were unstable, memory and concentration were "okay," speech was slurred, and insight and judgment were considered "fair." (Tr. 215.) She was diagnosed with depression, bipolar disorder, and panic attacks

---

[1]Effexor is used to treat depression. http://www.webmd.com/drugs (last visited April 14, 2011).

[2]Relafen is used to reduce pain, swelling, and joint stiffness from arthritis. http://www.webmd.com/drugs (last visited April 14, 2011).

and assigned a GAF score of 45.[3] (Id.) Dr. Ardekani prescribed her Effexor, Trazodone, Klonopin, and Lithium.[4]

On January 5, 2007, she was seen by Dr. Murray because she developed four slightly open areas on her left shin and knee area. (Tr. 176.) Dr. Murray opined that these areas could have been insect bites or folliculitis lesions that were secondarily excoriated, which Pearson denied. (Id.)

On February 13, 2007, Dr. Ardekani completed a questionnaire. (Tr. 212.) Dr. Ardekani opined that Pearson had anxiety, was agitated, and was irritable with panic. (Id.) Dr. Ardekani noted that she had no restrictions of daily activities, her concentration was poor, and she had repeated episodes of deterioration in a work-like setting. (Id.) Dr. Ardekani saw Pearson again in February 2007, March 2007, August 2007, and November 2007. (Tr. 240-44.)

On February 22, 2007, psychologist Judith McGee, Ph.D., completed a Psychiatric Review Technique Form. (Tr. 217-27.) Dr. McGee opined Pearson had mild restrictions of activities of daily living, mild restrictions in maintaining social functioning, moderate difficulties in maintaining concentration, persistence, or pace, and no episodes of decompensation. (Tr. 225.) Dr. McGee recognized Dr. Murray's and Dr.

---

[3]A GAF score, short for Global Assessment of Functioning, helps summarize a patient's overall ability to function. A GAF score has two components. The first component covers symptom severity and the second component covers functioning. A patient's GAF score represents the worst of the two components. American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders 32-34 (4th ed. 2000).

A GAF of 41 through 50 is characterized by serious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) or any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job). American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders 32-34 (4th ed. 2000).

[4]Trazodone is used to treat depression. It works by helping to restore the balance of serotonin in the brain. Klonopin is used to prevent and control seizures and panic attacks. It works by calming the brain and nerves. Lithium is used to treat manic-depressive order (bipolar disorder). It works to stabilize the mood and reduce extremes in behavior by restoring the balance of neurotransmitters in the brain. http://www.webmd.com/drugs (last visited April 14, 2011).

Ardekani's opinions, but opined that they are "not consistent with [the] inability to perform simple work." (Tr. 227.)

Dr. Murray completed a Mental Residual Function Capacity Assessment on February 22, 2007 and noted Pearson was moderately limited in her ability to: (1) understand and remember detailed instructions; (2) carry out detailed instructions; (3) maintain attention and concentration for extended periods; (4) perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances; (5) and complete a normal workday and workweek without interruptions from psychologically based symptoms. (Tr. 228-29). Dr. Murray opined that she was not significantly limited in her ability to: (1) remember locations and work-like procedures; (2) understand and remember very short and simple instructions; (3) carry out very short and simple instructions; (4) sustain an ordinary routine without special supervision; (5) work in coordination with or proximity to others without being distracted by them; (6) make simple work-related decisions; interact appropriately with the general public; (7) ask simple questions or request assistance; (8) accept instructions and respond appropriately to criticism from supervisors; (9) get along with coworkers or peers without distracting them or exhibiting behavioral extremes; (10) maintain socially appropriate behavior and adhere to basic standards of neatness and cleanliness; (11) respond appropriately to changes in the work setting; be aware of normal hazards and take appropriate precautions; (12) travel in unfamiliar places or use public transportation; and (13) set realistic goals or make plans independently of others. (Id.)

Dr. Ardekani saw Pearson on June 14, 2007 and noted that she looked better and that her mood was better. (Tr. 239.) On October 23, 2007, a cervical MRI revealed her spinal cord was intrinsically normal, but at the C5-6 disk level, she had a right paracentral osteophyte formation, with disk protrusion, causing an impression on the thecal sac to the right midline and contributing to narrowing of the intervertebral neural foramen at this level. (Tr. 271.) There was a similar, but less severe, change noted on the left posterolaterally where the impression on the thecal sac was mostly due to osteophyte formation emanating from the

inferior aspect of C5 disk and, to a lesser extend, the superior aspect of C6 disk. (Id.)

On November 9, 2007, Dr. Ardekani completed a Mental Residual Functional Capacity Questionnaire. (Tr. 232-37.) Dr. Ardekani diagnosed Pearson with bipolar disorder and chemical dependency, and assigned her a GAF score of 45-50, with a highest GAF in the past year of 45-50. (Tr. 232.) Pearson showed "marginal improvement" in response to treatment and her prognosis was "guarded." (Id.) Clinical findings included despondency, lack of motivation, social isolation, and passive death wishes. (Id.) Her signs and symptoms included: (1) anhedonia or pervasive loss of interest in almost all activities; (2) decreased energy; (3) thoughts of suicide; (4) feelings of guilt or worthlessness; (5) generalized persistent anxiety; (6) mood disturbance; (7) difficulty thinking or concentrating; (8) psychomotor agitation or retardation; (9) persistent disturbances of mood or affect; (10) substance dependence; (11) emotional withdrawal or isolation; (12) bipolar syndrome with a history of episodic periods manifested by the full symptomatic picture of both manic and depressive symptoms; and (13) sleep disturbance. (Tr. 233.) In assessing her ability to perform work-related activity, Dr. Ardekani noted that she was "[l]imited but satisfactory" in her ability to: (1) remember work-like procedures; (2) understand and remember very short and simple instructions; (3) carry out very short and simple instructions; (4) work in coordination with or proximity to others without being unduly distracted; (5) make simple work-related decisions; (6) ask simple questions or request assistance; (7) accept instructions and respond appropriately to criticism from supervisors; (8) get along with co-workers or peers without unduly distracting them or exhibiting behavioral extremes; (9) be aware of normal hazards and take appropriate precautions; (10) interact appropriately with the general public; (11) maintain socially appropriate behavior; (12) adhere to basic standards of neatness and cleanliness; (13) travel in unfamiliar places; and (14) use public transportation. (Tr. 234-35.) Dr. Ardekani noted that she was "[s]eriously limited, but not precluded" in her ability to: (1) maintain attention for two hour segments; (2) sustain an ordinary routine without special supervision; (3) perform at a consistent pace without an

unreasonable number and length of rest periods; (4) respond appropriately to changes in a routine work setting; (5) understand and remember detailed instructions, carry out detailed instructions; (6) set realistic goals or make plans independently of others; and (7) deal with the stress of semiskilled and skilled work. (Id.) Dr. Ardekani noted that she was "[u]nable to meet competitive standards" in her ability to: (1) maintain regular attendance and be punctual within customary, usually strict tolerances; (2) complete a normal workday and workweek without interruptions from psychologically based symptoms; and (3) deal with normal work stress. (Tr. 234.) Dr. Ardekani opined that her impairments or treatments would cause her to be absent from work more than four days per month. (Tr. 236.)

On November 19, 2007, Dr. Ardekani saw Pearson and noted she was diagnosed with bipolar disorder, was a recovering alcoholic and drug addict, and had been clean for at least one year. (Tr. 244.) She had been off of work since October 2006 from Chrysler. (Id.) On December 7, 2007, Dr. Ardekani noted she was in pain and needed to have surgery. (Tr. 245.)

On December 17, 2007, James L. Lu., M.D., performed cervical spine surgery on Pearson. (Tr. 248.)

On January 14, 2008, Dr. Ardekani noted that Pearson felt "antsy," was depressed, did not want to leave the house, had passive thoughts of suicide, saw shadows, and had financial difficulties. (Tr. 246.) Dr. Ardekani saw her again on April 4, 2008 and July 7, 2008. (Tr. 251, 250.)

On August 7, 2008, Dr. Murray saw Pearson for her medical issues, including hypothyroidism.[5] (Tr. 262.) On examination, Dr. Murray noted that her neck had some mild decreased range of motion with turning all the way to the right side, and there was some tightness in her right trapezius muscles. (Id.)

On August 13, 2008, an x-ray from St. Charles Clinic Medical Group showed postoperative changes with mild secondary degenerative changes at

---

[5]Hypothyroidism occurs when the thyroid does not make enough thyroid hormone. http://www.webmd.com (last visited April 14, 2011).

the C4-5 level in Pearson's cervical spine. (Tr. 258.) The rest of her vertebral bodies and disk spaces were relatively normal. (Id.)

On August 13, 2008, Dr. Lu saw Pearson and noted she was approximately eight months status post C5-6 surgery. (Tr. 259.) Pearson told Dr. Lu she was doing well with only occasional neck discomfort, which she managed with Ben-Gay. (Id.) She said she lost her balance in recent weeks and fell backwards, striking her right shoulder, right upper extremity, and lower back, which caused some right shoulder and right arm pain. (Id.)

Dr. Ardekani completed an updated Mental Residual Functional Capacity Questionnaire in May 2009. (Tr. 283-87.) He noted that Pearson remained diagnosed with bipolar disorder and chemical dependency, and assigned her a GAF score of 45-50. (Tr. 283.) He added the following signs and symptoms to his previous questionnaire: (1) intense and unstable interpersonal relationships and impulsive and damaging behavior; (2) delusions; (3) emotional lability; (4) easy distractibility; and (5) recurrent severe panic attacks manifested by sudden unpredictable onset of intense apprehension, fear, terror, and sense of impending doom. (Tr. 284.) Dr. Ardekani's assessment of her ability to perform work-related activity remained unchanged from his previous questionnaire. (Tr. 285-88.)

**Testimony at the hearing**

On December 16, 2008, Pearson testified to the following at a hearing before the ALJ. (Tr. 22-56.) She was 50 years old at the time and is divorced. (Tr. 26-27.) She lives with her mother in a mobile home, which has three stairs to get into it. (Tr. 27.) She received a high school diploma. (Id.) She is right handed, but can also use her left hand for gripping, holding, and lifting. (Tr. 27-28.) She is 5 feet 3 inches tall and weighed 130 pounds. (Tr. 28.) She can read and write. (Tr. 28-29.)

She served 20 days in jail or prison as "shock time" for her DUIs. (Tr. 29.) She had an alcohol problem and has not had an alcoholic beverage for seven years. (Id.) Once she quit consuming alcohol, she began using drugs, including methamphetamine, crack, cocaine, and

marijuana. (Tr. 29-31.) She tested positive for marijuana on June 4, 2006. (Tr. 30.)

She last worked on October 31, 2006, and took sick leave when she had a panic attack. (Tr. 31.) She retired from Chrysler in August 2008 on permanent disability and received $1,029 per month from Chrysler. (Tr. 32.) She also received payments from Chrysler of $2,254 in 2007, $7,725 in 2006, and $7,200 in 2006, which were her sick leave payments. (Tr. 32-33.)

She began working for Chrysler in 1995 and worked there for fifteen years. (Tr. 34.) At the beginning, she was a "floater" and would relieve people when they took breaks or were absent for medical reasons. (Id.) She worked on the main line and lifted items as heavy as fifty pounds, but the most frequent weight was twenty pounds. (Tr. 35.) Prior to the Chrysler job, she also had a quality control job at a car seat factory where she inspected the quality of car seats. (Tr. 35.) This job required no lifting, but she was on her feet inspecting the entire time. (Tr. 36.) Prior to that job, she was a dairy clerk at a Schnucks grocery store for four to five years, where she stocked items. (Tr. 36-37.) The lifting requirements were fifty pounds, which included lifting bigger crates and taking them to a dolly. (Id.)

She can no longer work because she has panic attacks a couple of times per week, which causes her to think everyone is looking at her. (Tr. 37.) When she was on break at work, she sat in the bathroom and tried to calm herself. (Id.) Once she stopped working, she still had panic attacks due to the stress of having no money. (Id.) She lost her driver's licence for ten years. (Tr. 38.) She is bipolar and just wants to lay in bed and hibernate. (Id.)

She has lifting limitations because she had neck surgery about a year ago where she had a titanium plate put in her neck. (Tr. 38-39.) Her shoulder and neck pain cause numbness in her arm and fingers. (Tr. 39.) Her pain is caused by lifting heavy things at Chrysler, but the company's doctor said it was from an accident. (Tr. 40.) Her current doctor says she cannot lift anything over forty pounds. (Id.) She thinks she can lift something that is up to forty pounds once or twice,

such as her grandchildren.  (Tr. 40-41.)  Her two grandchildren weigh twenty-five pounds and eighteen pounds.  (Tr. 41.)

She is taking Klonopin for anxiety, which helps her and does not cause any side effects.  (Tr. 41-42.)  She is taking muscle relaxers and aspirin for her neck pain, which do not help much.  (Tr. 42.)

She smokes a little less than a pack day.  (Tr. 43.)  At the house, she cooks, helps trim the trees, does dishes, does laundry, vacuums, takes the trash out, goes to the grocery store with her mom, loads the car with groceries and brings them in to the trailer.  (Tr. 43-45.)  She and her mom go out to eat about once a week, which is the only time she gets out of the house.  (Tr. 43-44.)  She has a hard time sleeping with her shoulder pain.  (Tr. 46.)  She can lift her arms overhead but has some limitations turning her neck because of the plate.  (Id.)

She is taking Effexor and Lamictal[6] for her bipolar disorder, which cause no side effects.  (Tr. 47.)  She also takes Trazodone at night to help her sleep.  (Id.)  Her memory is affected by her medications, which causes her to be in a state of confusion.  (Tr. 48.)

**Testimony of the Vocational Expert**

Vocational expert (VE) Jeffrey Francis Magrowski, Ph.D., also testified at the hearing.  (Tr. 48-54.)  Dr. Magrowski identified Pearson's vocational history over the past fifteen years, which included work at Chrysler as a production worker, work as an auto and truck assembler, work as a utility worker, and work as a dairy clerk or stocker.  (Tr. 50-51)  The first hypothetical assumed an individual: with Pearson's education, training, and work experience, who could: (1) occasionally lift twenty pounds, frequently lift ten pounds, stand, walk, or sit six hours in an eight-hour workday; (2) occasionally climb ladders and scaffolds, but never ropes; (3) understand, remember, and carry out at least simple instructions and non-detailed tasks; (4) demonstrate adequate judgment to make simple work related decisions; and (5) not work

---

[6]Lamictal is used to prevent and control seizures.  It works by restoring the balance of certain natural substances in the brain. http://www.webmd.com/drugs (last visited April 14, 2011).

in a setting which includes regular contact with the general public. (Tr. 51-52.) The VE said that this person could perform the assembly work at a light, unskilled exertional category, such as a bench assembly job, a bakery worker, or light stocking work. (Tr. 52.)

A second hypothetical by the ALJ included the same limitations as the first hypothetical person, but added the ability to respond appropriately to supervisors, co-workers in a task oriented setting where contact with others is casual and infrequent, and can maintain regular attendance in a work presence without special supervision. (Id.) The VE said this individual can perform the same jobs described in the first hypothetical. (Id.)

A third hypothetical by the ALJ included all of the same limitations, but added that this individual would be absent more than four days per month because of medical conditions. (Tr. 53-54.) The VE said this individual would not be able to maintain a job. (Tr. 54.)

### III. DECISION OF THE ALJ

On February 25, 2009, the ALJ issued a decision denying plaintiff's claims. (Tr. 8-21.) The ALJ found Pearson's severe impairments were affective mood disorder and degenerative disk disease of the cervical spine. (Tr. 13.) The ALJ found that she did not have an impairment or combination of impairments that met or medically equaled one of the listed impairments under the Act. (Id.) The ALJ found that Pearson has the residual functional capacity ("RFC") to perform light work subject to no climbing ropes and only occasionally climbing ladders or scaffolds and reaching overhead. (Tr. 14.) Additionally, she can demonstrate adequate judgment to make simple work-related decisions; remember and carry out at least simple tasks; respond appropriately to supervisors and co-workers in a task-oriented setting where contact with others is casual and infrequent; and maintain regular attendance and work presence without special supervision. (Id.) She should not work in a setting which includes constant or regular contact with the general public. (Tr. 14-15.) The ALJ determined that, although Pearson's impairments would prevent her from performing her past relevant work, they would not prevent the performance of other work existing in significant numbers in

the national economy. (Tr. 19-20.) Consequently, the ALJ found she was not disabled as defined under the Act. (Tr. 20.)

### IV. GENERAL LEGAL PRINCIPLES

The court's role on judicial review of the Commissioner's decision is to determine whether the Commissioner's findings comply with the relevant legal requirements and is supported by substantial evidence in the record as a whole. Pate-Fires v. Astrue, 564 F.3d 935, 942 (8th Cir. 2009). "Substantial evidence is less than a preponderance, but is enough that a reasonable mind would find it adequate to support the Commissioner's conclusion." Id. In determining whether the evidence is substantial, the court considers evidence that both supports and detracts from the Commissioner's decision. Id. As long as substantial evidence supports the decision, the court may not reverse it merely because substantial evidence exists in the record that would support a contrary outcome or because the court would have decided the case differently. See Krogmeier v. Barnhart, 294 F.3d 1019, 1022 (8th Cir. 2002).

To be entitled to disability benefits, a claimant must prove she is unable to perform any substantial gainful activity due to a medically determinable physical or mental impairment that would either result in death or which has lasted or could be expected to last for at least twelve continuous months. 42 U.S.C. §§ 423(a)(1)(D), (d)(1)(A), 1382c(a)(3)(A); Pate-Fires, 564 F.3d at 942. A five-step regulatory framework is used to determine whether an individual qualifies for disability. 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4); see also Bowen v. Yuckert, 482 U.S. 137, 140-42 (1987) (describing the five-step process); Pate-Fires, 564 F.3d at 942.

Steps One through Three require the claimant to prove (1) she is not currently engaged in substantial gainful activity, (2) she suffers from a severe impairment, and (3) her disability meets or equals a listed impairment. Pate-Fires, 564 F.3d at 942. If the claimant does not suffer from a listed impairment or its equivalent, the Commissioner's analysis proceeds to Steps Four and Five. Id. Step Four requires the Commissioner to consider whether the claimant retains the RFC to perform past relevant work. Id. The claimant bears the burden of demonstrating

she is no longer able to return to her past relevant work.  Id.  If the Commissioner determines the claimant cannot return to past relevant work, the burden shifts to the Commissioner at Step Five to show the claimant retains the RFC to perform other work.  Id.

## V. DISCUSSION

Pearson contends the ALJ erred in failing to identify medical evidence for his findings of RFC.  Pearson also argues the RFC is flawed, and thus the hypothetical question to the VE and his response cannot be considered substantial evidence.

**A. Residual Functional Capacity**

Pearson argues the ALJ erred in concluding that she retained the ability to perform light work without identifying supporting substantial evidence.  Specifically, she contends that RFC is a medical determination which requires some medical evidence, and the ALJ should have obtained medical evidence that addressed the claimant's functional ability in a workplace.  See Singh v. Apfel, 222 F.3d 448, 451 (8th Cir. 2000); Lauer v. Apfel, 245 F.3d 700, 704 (8th Cir. 2001).

While the formulation of RFC is a medical question, Nevland v. Apfel, 204 F.3d 853, 858 (8th Cir. 2000), it is based on all the relevant, credible evidence of record including the medical records, observations of treating physicians and others, and an individual's own description of limitations.  See McKinney v. Apfel, 228 F.3d 860, 863 (8th Cir. 2000).  "It is the claimant's burden, and not the Social Security Commissioner's burden, to prove the claimant's RFC."  Baldwin v. Barnhart, 349 F.3d 549, 556 (8th Cir. 2003).

Pearson argues the ALJ improperly discounted the opinion of her treating physician, Dr. Ardekani, which supported greater RFC limitations.  A treating physician's opinion is generally given controlling weight, but is not inherently entitled to it.  Davidson v. Astrue, 578 F.3d 838, 842 (8th Cir. 2009).  See 20 C.F.R. § 404.1527(d)(2).  "A physician's statement that is not supported by diagnoses based on objective evidence will not support a finding of disability."  Travis v. Astrue, 477 F.3d 1037, 1041 (8th Cir. 2007).  "If

the doctor's opinion is inconsistent with or contrary to the medical evidence as a whole, the ALJ can accord it less weight." Id.; see also Hacker v. Barnhart, 459 F.3d 934, 937 (8th Cir. 2006); 20 C.F.R. § 404.1527(d)(2).

The ALJ provided sufficient reasons for discounting Dr. Ardekani's opinion. The ALJ reasoned that Dr. Ardekani's opinion that Pearson was unreliable in the workplace is not supported by the record, as Pearson was able to attend all scheduled appointments, there was no tardiness noted, nor were there any indications in the treatment notes that she would likely have such difficulty. See e.g., Whosendorfe v. Astrue, No. CV-09-6003-PK, 2010 WL 2179553, *9 (D.Or. May 5, 2010); Ford v. Astrue, No. CV-09-0098-JPH, 2010 WL 1441208, *8 (E.D. Wash. April 8, 2010). The ALJ did not err in discounting Dr. Ardekani's opinion as internally inconsistent. (Tr. 17.) Although Pearson testified that she experienced panic attacks "a couple of times a week sometimes," her treatment notes have no indication that she reported such a frequency of panic attacks to her physicians. (Tr. 37.) An ALJ's explicit discrediting of claimant's testimony is supported by substantial evidence if the claimant's testimony differed significantly from her reports to physicians on important issues such as frequency. Thompson v. Astrue, 226 Fed. App'x 617, 619-620 (8th Cir. 2007). The ALJ also noted that "[t]he record does not demonstrate complete inability to function independently outside the area of one's home." (Tr. 17.) Pearson testified that she eats out at least once a week and shops at Walmart and Shop 'n Save. (Tr. 43, 45.)

The ALJ noted that Pearson had "some breakthrough anxiety symptoms at work," but the record does not support "generalized persistent anxiety . . . existing for twelve consecutive months in duration." (Tr. 15.) The record also indicates her medications help her with sleep and motivation. See Brace v. Astrue, 578 F.3d 882, 885 (8th Cir. 2009) ("If an impairment can be controlled by treatment or medication, it cannot be considered disabling."). The ALJ also noted that Pearson's three month psychiatric visit schedule indicates an impairment that is not considered severely limiting and serious in nature that would require a more frequent treatment schedule. See 20 C.F.R. § 404.1527(d)(2)(i); Casey

v. Astrue, 503 F.3d 687, 693 (8th Cir. 2007) (ALJ properly discounted treating physician's opinion based on the infrequent nature of the treatment visits).

The ALJ noted the record medical notes are devoid of any objective medical observations by treating physicians of any significant abnormalities or deficits with respect to the claimant's concentration, social interaction, activities of daily living, abilities to cope with low stress, abilities to work without decompensation, abilities to understand and follow instructions, and cognitive function or behavior. (Tr. 16.) Much of Dr. Ardekani's opinions support a finding that Pearson can perform unskilled work. (Tr. 285-86.)

Pearson also underwent cervical disk surgery at the C5-6 level on December 17, 2007. (Tr. 248.) The record indicates that she obtained nearly complete relief from this procedure and was limited to lifting no more than forty pounds, which is well within the above-established RFC. (Id.) A follow up MRI on August 13, 2008 "show[ed] normal alignment of the vertebral bodies" and "some mild degenerative changes seen at the C4-5 level" while "[t]he rest of the vertebral bodies and disk spaces appear[ed] relatively normal." (Tr. 258.) Pearson reported doing well with occasional neck discomfort which she managed with application of Ben-Gay. (Tr. 259.) See Combs v. Astrue, 243 Fed. App'x 200, 205 (8th Cir. 2007) ("Over-the-counter medications are inconsistent with complaints of disabling pain."). She had normal range of motion, strength, and muscle tone. (Id.)

The ALJ "restricted Pearson's RFC to no greater exertional ability than that found within the light category, a twenty-pound weight lift less than indicated by her treating neurologist." (Tr. 18.) Her treating neurologist, Dr. Lu, opined that she could lift up to forty pounds. (Tr. 248.) The medical records are devoid of any evidence that would restrict Pearson to lesser exertional limitations. Pearson testified that she is able to lift her grandchildren, who weigh twenty-five pounds and eighteen pounds. (Tr. 41.) She also testified she is able to do the dishes, do laundry, take the trash out, and has no limitations with walking, sitting, or standing. (Tr. 43-45.)

Pearson next argues the ALJ was required to re-contact the examining physician for clarification when the evidence is consistent but is not sufficient to decide whether the claimant is disabled; or, if after weighing the evidence, the ALJ is not able to reach a conclusion about whether the claimant is disabled. 20 C.F.R. § 416.927(c)(3).

"A social security hearing is a non-adversarial proceeding, and the ALJ has a duty to fully develop the record." Smith v. Barnhart, 435 F.3d 926, 930 (8th Cir. 2006). That duty includes a duty to contact a treating physician for clarification of an opinion, but "only if the available evidence does not provide an adequate basis for determining the merits of the disability claim." Sultan v. Barnhart, 368 F.3d 857, 863 (8th Cir. 2004). Put another way, the ALJ's duty to contact a treating physician for clarification is triggered when "a crucial issue is undeveloped." Ellis v. Barnhart, 392 F.3d 988, 994 (8th Cir. 2005). See also 20 C.F.R. § 404.1512(e). For example, if the treating physician's report "contains a conflict or ambiguity that must be resolved, the report does not contain all the necessary information, or does not appear to be based on medically acceptable clinical and laboratory diagnostic techniques," then the ALJ must contact the treating physician for clarification. 20 C.F.R. § 404.1512(e)(1); see also Goff v. Barnhart, 421 F.3d 785, 791 (8th Cir. 2005). However, the ALJ need not contact a treating physician whose opinion is "inherently contradictory or unreliable." Hacker v. Barnhart, 459 F.3d 934, 938 (8th Cir. 2006).

Here, the ALJ did not find Dr. Ardekani's records inadequate, unclear, or incomplete, nor did it find that a crucial issue was undeveloped. Instead, the ALJ discounted his opinion because it was inconsistent with other substantial evidence. In such cases, an ALJ need not re-contact a physician. Goff, 421 F.3d at 791.

**2. Vocational Expert Testimony**

Pearson next argues the ALJ's decision improperly relied on the testimony of the VE because the hypothetical questions posed by the ALJ were based upon a flawed RFC.

Hypothetical questions posed to a VE must precisely describe a claimant's impairments so that the VE may accurately assess whether jobs exist for the claimant. Howard v. Massanari, 255 F.3d 577, 581-82 (8th Cir. 2001). VE testimony based on an insufficient hypothetical question may not constitute substantial evidence upon which a decision may be based. Id. at 695. A hypothetical is sufficient if it sets forth impairments supported by substantial evidence in the record and accepted as true by the ALJ. Davis v. Apfel, 239 F.3d 962, 966 (8th Cir. 2001).

Here, the hypothetical questions posed to the VE were proper because the ALJ's RFC determination is supported by substantial evidence and the hypothetical posed to the VE accurately reflects the RFC determination made. Therefore, the ALJ did not err in affording the VE's testimony substantial weight.

## VI. CONCLUSION

For the reasons set forth above, the decision of the Commissioner of Social Security is affirmed. As appropriate Judgment Order is issued herewith.

/S/   David D. Noce
**UNITED STATES MAGISTRATE JUDGE**

Signed on September 27, 2011.